

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO. 3:25-00022 |
| v. | ) | |
| | ) | 18 U.S.C. § 371 |
| [1] YILIBETH DEL CARMEN RIVERO-DE CALDERA | ) | 18 U.S.C. § 922(g)(5) |
|     a/k/a "YIBI" | ) | 18 U.S.C. § 924 |
| | ) | 18 U.S.C. § 1591(a)(1) |
| [2] KLEIVER DANIEL MOTA RIVERO | ) | 18 U.S.C. § 1594(c) |
|     a/k/a "KLEIBER" | ) | 18 U.S.C. § 1952 |
| | ) | 18 U.S.C. § 2421 |
| [3] YURIBETZI DEL VALLE GOMEZ MACHUCA | ) | |
|     a/k/a "LA GORDA" | ) | |
| | ) | |
| [4] WILMARYS DEL VALLE MANZANO SOLORZANO | ) | |
|     a/k/a "LA CHINA" | ) | |
| | ) | |
| [5] ENDRIK ALEXANDER MORALES-RIVERO | ) | |
|     a/k/a "ENDRI" | ) | |
| | ) | |
| [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO | ) | |
|     a/k/a "NANI" | ) | |
|     a/k/a "NANY" | ) | |
| | ) | |
| [7] FRANKYANNA DEL VALLE ROMERO-RIVERO | ) | |
|     a/k/a "FRANYA" | ) | |
| | ) | |
| [8] JESUS ENRIQUE CASTILLO RODRIGUEZ | ) | |
|     a/k/a "CHU CHU" | ) | |

# INDICTMENT

THE GRAND JURY CHARGES:

**OVERVIEW OF THE CRIMINAL ENTERPRISE**

At all times relevant to this Indictment:

1.      The defendants, along with others known and unknown to the Grand Jury, worked together to recruit and bring women, known and unknown to the Grand Jury, from Central and South

America to the United States, including into the Middle District of Tennessee and elsewhere, where the defendants operated an unlawful commercial sex business enterprise.

2. Defendant **[1] YILIBETH DEL CARMEN RIVERO-DEL CALDERA a/k/a "Yibi," ("RIVERO")** is a Venezuelan National and Citizen, as are all additional defendants.

3. Defendants **[2] KLEIVER DANIEL MOTA RIVERO a/k/a "Kleiber" ("MOTA"), [5] ENDRIK ALEXANDER MORALES-RIVERO a/k/a "Endri" ("MORALES"),** and **[7] FRANKYANNA DEL VALLE ROMERO-RIVERO a/k/a "Franya" ("ROMERO")** are **[1] RIVERO'S** adult children.

4. Defendant **[6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO a/k/a "Nany" or "Nani" ("GUTIERREZ"),** and **[8] JESUS ENRIQUE CASTILLO RODRIGUEZ a/k/a "Chu Chu" ("CASTILLO"),** are the spouses of **[5] MORALES** and **[7] ROMERO**, respectively.

5. Defendant **[4] WILMARYS DEL VALLE MANZANO SOLORZANO a/k/a "La China" ("MANZANO")** was in a romantic relationship with **[2] MOTA** throughout the charged timeframe.

6. Defendant **[3] YURIBETZI DEL VALLE GOMEZ MACHUCA a/k/a "La Gorda" ("GOMEZ")** is an associate of **[1] RIVERO's** family and is unrelated by blood or marriage to the other defendants.

7. Members of the sex trafficking conspiracy, specifically the defendants charged in Count Three below, conspired to target and recruit young, poor, and vulnerable women from Venezuela and other South and Central American countries with the intent of transporting them into the United States and profiting from the women's commercial sex acts.

8. Two members of the sex trafficking conspiracy, **[1] RIVERO** and **[2] MOTA,**

communicated to these women, prior to their travel, that they would be required to pay back the cost of their travel into the United States, in many cases promising them legitimate work in the U.S. and a place to stay once they arrived.

9. The defendants then financially and logistically facilitated the travel of the young women, using international payment systems, the internet, cellular phones, and airlines; sometimes personally accompanied them through part of their journeys; and provided contact information for them to give to U.S. immigration officials once they reached the southern U.S. border.

10. Once the victims arrived to present themselves at the southern U.S. border, the defendants arranged for and facilitated their air travel or other means of travel from the southern U.S. border into the Middle District of Tennessee for the purpose of commercial sex and exploitation.

11. Only after the victims were either on their journey, or had arrived in the United States, did the members of the sex trafficking conspiracy, specifically the defendants charged in Count Three below, tell the victims that they would be charged an intentionally inflated debt and that the women would be required to perform commercial sex acts for the defendants' benefit until, and sometimes even after, the debt was repaid.

12. Two members of the sex trafficking conspiracy, **[1] RIVERO** and **[2] MOTA,** imposed debts upon the victims that far exceeded the actual cost of the victims' trips to the southern U.S. border, and the defendants further manipulated the debts to make it difficult, if not impossible in some cases, for the victims to pay down the debt.

13. Members of the sex trafficking conspiracy, specifically the defendants charged in Count Three below, monitored the victims via electronic communication and physical surveillance on a near-constant basis and collected the proceeds of commercial sex acts performed by the victims daily.

14. Members of the sex trafficking conspiracy, specifically the defendants charged in Count Three below, compelled some of the victims to perform and to continue performing commercial sex by threats of the use of force against them and their families, by threats of reputational damage and immigration harm, through separation from their children and, in some cases, by withholding the victims' access to their identification and immigration documents to keep them working for the defendants' financial benefit.

15. Two members of the sex trafficking conspiracy, **[1] RIVERO** and **[2] MOTA,** also used their ties to the Venezuelan gang, Tren de Aragua (TdA), known to Venezuelans as an inherently violent gang, to cause the victims to continue engaging in commercial sex acts out of fear of the serious harm that they or their families would suffer if they attempted to leave prior to paying off their debts through engaging in commercial sex acts.

## COUNT ONE
### (Conspiracy to Commit Interstate Transportation for Purposes of Prostitution)

16. The allegations in Paragraphs 1 through 15 are incorporated here.

17. Beginning no later than in or about July 2022, and continuing through on or about March 13, 2024, in the Middle District of Tennessee and elsewhere, **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "Yibi," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber," [3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "La Gorda," [4] WILMARYS DEL VALLE MANZANO SOLORZANO, a/k/a "La China," [5] ENDRIK ALEXANDER MORALES-RIVERO, a/k/a "Endri," [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO, a/k/a "Nany" or "Nani," [7] FRANKYANNA DEL VALLE ROMERO-RIVERO a/k/a "Franya,"** and **[8] JESUS ENRIQUE CASTILLO RODRIGUEZ a/k/a "Chu Chu,"** the defendants herein, did knowingly conspire with each other and others known and unknown to the Grand Jury, and agreed to transport adult females whose identities are

4

known and unknown to the Grand Jury in interstate and foreign commerce with the intent that the adult females engage in prostitution and in any sexual activity for which any person can be charged with a criminal offense.

In violation of Title 18, United States Code, Sections 371 and 2421(a).

## Object of the Conspiracy

18. An object of the conspiracy was to recruit, entice, and transport young women from Venezuela and other Central and South American countries to the United States, and to profit financially from the women's prostitution and illegal sexual activities in Nashville, Tennessee.

## Manner and Means of the Conspiracy

19. As part of the conspiracy, the defendants recruited women who were from poor families, had limited education, often were single mothers, did not speak English, and who had little to no economic prospects in their severely impoverished home countries for supporting themselves and their families.

20. The defendants and their associates sent money to the victims using international money transfer services to finance their transportation to the United States, hired smugglers to assist, and, in some instances, personally accompanied the victims.

21. Once the victims arrived in the United States, the defendants and others purchased flights to transport the victims to the Middle District of Tennessee and elsewhere.

22. The defendants then transported victims to local hotels in the Nashville, Tennessee area, sometimes spending time at private homes the defendants occupied first.

23. Once the recruited women arrived in Nashville, Tennessee, the defendants created and posted online commercial sex advertisements, and the women engaged in prostitution for the defendants' financial benefit.

24. The defendants served as recruiters, transporters, promoters, dispatchers, money collectors, and enforcers for the prostitution enterprise.

## Overt Acts

25. In or about the summer of 2022, **[1] RIVERO** invited Adult Victim 1 ("AV1"), whose identity is known to the Grand Jury, to come to the U.S. for a job opportunity.

26. **[1] RIVERO** offered to finance AV1's trip from South America to the United States, which **[1] RIVERO** estimated to AV1 would be no more than $6,000, which AV1 would repay once she arrived and started working in the U.S.

27. **[2] MOTA, [4] MANZANO**, and another individual whose identity is known to the Grand Jury traveled with AV1 through Mexico to the southern U.S. border.

28. In or about September 2022, AV1 traveled by bus with **[4] MANZANO** from the southern U.S. border to Houston, Texas, where she stayed in a home rented by **[7] ROMERO** and **[8] CASTILLO** for approximately two weeks.

29. In or about October 2022, **[1] RIVERO, [4] MANZANO**, and another individual whose identity is known to the Grand Jury flew with AV1 from Houston, Texas, to Nashville, Tennessee.

30. On the flight, **[1] RIVERO** informed AV1 that AV1 now owed **[1] RIVERO** $15,000 in exchange for financing AV1's trip and that AV1 would repay the debt by engaging in commercial sex at **[1] RIVERO'S** direction.

31. Shortly after arriving in Nashville, Tennessee, AV1 began engaging in commercial sex at a hotel.

32. In or about the fall of 2023, **[4] MANZANO**, then living in the Middle District of Tennessee, communicated to Adult Victim 2 ("AV2"), whose identity is known to the Grand Jury,

that she and **[2] MOTA** would help finance AV2's journey to the United States, that AV2 could live with **[4] MANZANO** when she arrived, and that AV2 would have to pay off her travel debt.

33. In or about the fall of 2023, at **[2] MOTA's** request, **[6] GUTIERREZ** sent money via Western Union to finance the journeys of AV2 and Adult Victim 3 ("AV3"), whose identity is known to the Grand Jury, from South America to the United States.

34. In or about the fall of 2023, **[1] RIVERO** also sent money via Western Union to AV2 to finance her journey from South America to the United States.

35. In or about the fall of 2023, **[2] MOTA** communicated with AV2 and AV3 via text message to inform them of payments sent to finance their journeys from South America to the United States.

36. In or about the fall of 2023, **[2] MOTA** informed AV2 while she was in Mexico en route to the United States, that she would owe a $30,000 debt when she arrived in the United States, even though she had only been sent a few thousand dollars by the defendants to finance her trip by that point. **[2] MOTA** further informed AV2 that she knew what she would have to do for work to pay off the debt, which she understood to mean prostitution.

37. In or about November 2023, AV2 crossed the southern U.S. border and presented herself for inspection by immigration authorities. Once she was released from immigration custody, **[1] RIVERO** and **[2] MOTA** arranged for a plane ticket to be purchased for AV2 to fly to Nashville, Tennessee, and, when AV2 arrived at the Nashville airport, **[2] MOTA** picked her up and transported her to his home in the Middle District of Tennessee.

38. After approximately one week residing in **[2] MOTA's** home, **[2] MOTA** and **[4] MANZANO** took AV2 to a hotel in Nashville, Tennessee, where AV2 met **[1] RIVERO**. **[1] RIVERO** took photos of AV2 to use in online commercial sex advertisements. AV2 thereafter began engaging in commercial sex with clients at the hotel.

7

39. In or about December 2023, **[1] RIVERO** and **[2] MOTA** exchanged text messages in which they discussed flight arrangements to facilitate the transport of AV3 and her child from San Antonio, Texas to Nashville, Tennessee after they crossed the southern U.S. border. **[2] MOTA** then provided the information for the flight purchased by the defendants to AV3 via text message.

40. Upon the arrival of AV3 to Nashville, Tennessee after the defendants had financed her journey from South America, **[3] GOMEZ** informed AV3 that she owed a debt of $30,000—significantly more than the amount the defendants sent her to fund her trip—and would have to pay it off by engaging in prostitution.

41. In or about April 2023, **[5] MORALES** traveled with Adult Victim 4 ("AV4") whose identity is known to the Grand Jury, for a portion of her journey from Colombia to the southern U.S. border. During the journey, **[5] MORALES** informed AV4 that she would be engaging in prostitution for **[1] RIVERO's** financial benefit upon arriving in the United States.

42. In or about June 2023, **[1] RIVERO** sent a photograph of a Venezuelan identification card of Adult Victim 5 ("AV5"), whose identity is known to the Grand Jury, to **[8] CASTILLO** via text message. **[8] CASTILLO** purchased a flight for this victim from Denver, Colorado to Nashville, Tennessee. **[1] RIVERO** then texted a screenshot to **[8] CASTILLO** showing a money transfer to **[7] ROMERO** for approximately the same amount as the purchased flight. AV5 thereafter appeared in online commercial sex advertisements in the Nashville area.

43. In or about September 2023, **[3] GOMEZ** traveled with Adult Victim 6 ("AV6"), whose identity is known to the Grand Jury, from Texas to Nashville, Tennessee, shortly after the two crossed the southern U.S. border together. Thereafter, AV6 crossed the border and traveled to Nashville, Tennessee with **[3] GOMEZ** and appeared in online commercial sex advertisements

8

that **[6] GUTIERREZ** posted, and thereafter the victim engaged in prostitution in the Middle District of Tennessee.

44. Between in or about September 2022 and continuing through on or about March 13, 2024, **[5] MORALES, [6] GUTIERREZ, [7] ROMERO, and [8] CASTILLO** communicated with commercial sex buyers via text message and other messaging platforms on their cellular devices, dispatched said buyers to hotel rooms that the adult female victims occupied, and collected payment for commercial sex acts the adult females performed, either electronically or in cash.

All in violation of Title 18, United States Code, Sections 371 and 2421(a).

## COUNT TWO
### (Conspiracy to Commit Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises)

45. The allegations in Paragraphs 1 through 44 are incorporated here.

46. Beginning not later than in or about July 2022, and continuing through on or about March 13, 2024, in the Middle District of Tennessee and elsewhere, **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "Yibi," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber," [3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "La Gorda," [4] WILMARYS DEL VALLE MANZANO SOLORZANO, a/k/a "La China," [5] ENDRIK ALEXANDER MORALES-RIVERO, a/k/a "Endri," [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO, a/k/a "Nany" or "Nani," [7] FRANKYANNA DEL VALLE ROMERO-RIVERO, a/k/a "Franya," and [8] JESUS ENRIQUE CASTILLO RODRIGUEZ a/k/a "Chu Chu,"** defendants herein, did knowingly conspire with each other and others known and unknown to the Grand Jury, to travel in interstate or foreign commerce, and to use and cause to be used, one or more facilities in interstate commerce, including the internet and cellular telephones, with the intent to promote, manage, establish, carry on, and facilitate the promotion,

9

management, establishment, and carrying on of an unlawful activity, that is, a business enterprise involving prostitution offenses in violation of the laws of Tennessee, and thereafter performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

In violation of Title 18, United States Code, Sections 371, 1952(a)(3)(A) and (b).

### Object of the Conspiracy

47. An object of the conspiracy included the defendants' interstate and foreign travel and use of the internet and cellular devices and other facilities of interstate commerce to facilitate the victims' travel into the Middle District of Tennessee and elsewhere, to post online commercial sex advertisements for these victims to solicit commercial sex buyers to the hotels where the victims stayed, dispatching the commercial sex buyers to the hotels, and collecting cash and online electronic payments from those unlawful commercial sex acts for the defendants' profit.

### Manner and Means of the Conspiracy

48. To facilitate the victims' travel from South and Central America into the United States, including into the Middle District of Tennessee and elsewhere, the defendants transmitted funds using international electronic payment systems, such as Western Union, MoneyGram, and others, to finance the victims' journeys for the purpose of transporting the victims through foreign and interstate commerce so that the victims could engage in prostitution offenses in violation of the laws of the State of Tennessee that the defendants managed in the Middle District of Tennessee and elsewhere.

49. Upon arriving in the United States, the victims began engaging in prostitution the defendants facilitated using internet websites known for the purpose of promoting and soliciting prostitution, including, MegaPersonals.eu.

50. The defendants, working together and with others known and unknown to the Grand Jury, used the internet websites to post commercial sex advertisements of the victims to solicit commercial sex buyers to arrange to engage in prostitution with the victims in hotels in the Nashville, Tennessee area, and elsewhere.

51. The defendants communicated with commercial sex buyers using their cellular telephones' messaging apps and internet messaging services like WhatsApp and others, to negotiate rates for commercial sex acts the victims would perform and thereafter direct the commercial sex buyers to the victims' hotel rooms to perform unlawful commercial sex acts.

52. After negotiating with commercial sex buyers about the prices of commercial sex to be performed by the victims, the defendants collected the payments made by those commercial sex buyers, sometimes in cash but often using other internet electronic payment systems like CashApp and Zelle.

53. The defendants used the prostitution proceeds of commercial sex acts to, among other things, rent hotel rooms, purchase condoms, lubricants, and other items needed to carry on a continuous and ongoing prostitution enterprise.

## Overt Acts

54. **[6] GUTIERREZ** sent thousands of text messages to **[1] RIVERO** from her cellular device to **[1] RIVERO'S** cellular device during the dates relevant to this indictment. By and large, those messages communicated to **[1] RIVERO** that **[6] GUTIERREZ** was sending commercial sex buyers to specific hotel rooms that were occupied by victims in the Nashville, Tennessee area.

55. **[5] MORALES, [7] ROMERO, and [8] CASTILLO** also sent text messages to **[1] RIVERO** from their cellular devices during the dates relevant to this indictment to communicate

11

with her regarding the commercial sex buyers they were dispatching to the victims' hotel rooms for the purpose of engaging in commercial sex acts.

56. **[1] RIVERO** and **[2] MOTA** paid defendants **[5] MORALES, [6] GUTIERREZ, [7] ROMERO, and [8] CASTILLO**, commissions from the proceeds of the commercial sex acts the victims in the hotels engaged in with commercial sex buyers the defendants solicited using the online commercial sex ads they posted on the internet.

57. **[3] GOMEZ** stayed in the hotels in the Nashville, Tennessee area with the victims and served as an enforcer on behalf of **[1] RIVERO** and **[2] MOTA** to monitor and ensure that the victims followed the rules of the organization and did not flee.

58. **[3] GOMEZ** also accompanied **[1] RIVERO** to collect the commercial sex cash proceeds from the victims at the hotels where they were staying.

59. **[3] GOMEZ** also purchased condoms manufactured outside of the state of Tennessee to provide to the victims engaging in commercial sex in the hotel rooms in the Nashville, Tennessee area.

60. **[1] RIVERO** and **[2] MOTA** directed the foreign and interstate travel of the victims traveling from South and Central America into the United States and ultimately into the Middle District of Tennessee and elsewhere for the purpose of prostitution in violation of the laws of the State of Tennessee.

61. **[1] RIVERO** and **[2] MOTA** directed others known and unknown to the Grand Jury to purchase flights for the victims so that they could travel to engage in commercial sex acts in the Middle District of Tennessee and elsewhere.

62. After **[1] RIVERO** recruited AV1, **[4] MANZANO** and **[2] MOTA** traveled with AV1 for a portion of her journey from Mexico to the U.S. where she thereafter engaged in commercial sex acts in the Middle District of Tennessee and elsewhere.

63. In or around the fall of 2023, **[4] MANZANO** used her cellular device to communicate with and recruit AV2 while AV2 was still in South America with the purpose that AV2 travel to the U.S. and engage in the defendants' prostitution enterprise in the Middle District of Tennessee and elsewhere.

64. **[1] RIVERO** and **[2] MOTA** used messaging applications on their cellular phones to communicate with each other about, and direct the travel of, AV3 as she traveled into the United States in or around November 2023.

65. AV3 thereafter appeared in online commercial sex advertisements in the Middle District of Tennessee. The posting fees of those ads were paid for by **[5] MORALES** and others.

All violation of Title 18, United States Code, Sections 371, 1952(a)(3)(A) and (b).

## COUNT THREE
### (Sex Trafficking Conspiracy)

66. The allegations in Paragraphs 1 through 65 are incorporated here.

67. Beginning no later than in or about July 2022, and continuing through on or about March 13, 2024, in the Middle District of Tennessee and elsewhere, **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "YIBI," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "KLEIBER," and [3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "La Gorda,"** together with others known and unknown to the Grand Jury, did knowingly and intentionally, in and affecting interstate commerce, conspire to recruit, entice, harbor, transport, provide, obtain, and maintain, adult females whose identities are known and unknown to the grand jury, by any means, knowing and in reckless disregard of the fact that means of force, threats of force, fraud,

13

and coercion, and any combination of such means, would be used to cause these adult females to engage in commercial sex acts.

In violation of Title 18, United States Code, Sections 1594(c) and 1591(a)(1).

## COUNT FOUR
### (Possession of a Firearm by an Illegal Alien)

68. On or about March 13, 2024, in the Middle District of Tennessee, **[2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber,"** knowing he was an alien illegally and unlawfully in the United States, knowingly possessed, in and affecting commerce, a firearm, to wit: a Glock GmbH Model 17 caliber 9x19 pistol, said firearm having been shipped and transported in interstate and foreign commerce.

In violation of Title 18, United States Code, Sections 922(g)(5) and 924.

## FORFEITURE ALLEGATION

The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

Pursuant to Title 18 United States Code, Sections 981(a)(1)(C) and Title 28 United States Code Section 2461(c), the United States gives notice to the defendants **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "Yibi," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber," [3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "La Gorda," [4] WILMARYS DEL VALLE MANZANO SOLORZANO, a/k/a "La China," [5] ENDRIK ALEXANDER MORALES-RIVERO, a/k/a "Endri," [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO, a/k/a "Nany" or "Nani," [7] FRANKYANNA DEL VALLE ROMERO-RIVERO, a/k/a "Franya,"** and **[8] JESUS ENRIQUE CASTILLO RODRIGUEZ, a/k/a "Chu Chu,"** that upon conviction of either Count One or Count Two of this indictment, the United States intends to seek forfeiture of all property, real or personal, constituting

14

or derived from proceeds obtained, directly or indirectly, as the result of the offense(s).

Upon conviction of Count Three, **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "Yibi," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber,"** and **[3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "La Gorda",** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1594(d)(1) and (2):

(1) any property, real or personal, that was involved in, used or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property; and

(2) any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property

including but not limited to a money judgment representing the value of the property, real or personal, involved in, used or intended to be used to commit or to facilitate the commission of such violation(s), and any property traceable to such property and the value of the property, real or personal, constituting or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property.

Upon conviction of Count Four of this Indictment, **[2] KLEIVER DANIEL MOTA RIVERO, a/k/a "Kleiber,"** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1) by Title 28, United States Code, Section 2461(c), any firearm or ammunition involved in or used in any knowing violation of the offense, or intended to be used in the offense, including a Glock GmbH Model 17 caliber 9x19 pistol and related ammunition.

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "YIBI," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "KLEIBER," [3] YURIBETZI DEL VALLE GOMEZ MACHUCA a/k/a "LA GORDA," [4] WILMARYS DEL VALLE MANZANO SOLORZANO a/k/a "LA CHINA," [5] ENDRIK ALEXANDER MORALES-RIVERO, a/k/a "ENDRI," [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO a/k/a "NANI" or "NANY," [7] FRANKYANNA DEL VALLE ROMERO-RIVERO a/k/a "FRANYA," and [8] JESUS ENRIQUE CASTILLO RODRIGUEZ a/k/a "CHU CHU,"**:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of **[1] YILIBETH DEL CARMEN RIVERO-DE CALDERA, a/k/a "YIBI," [2] KLEIVER DANIEL MOTA RIVERO, a/k/a "KLEIBER," [3] YURIBETZI DEL VALLE GOMEZ MACHUCA, a/k/a "LA GORDA," [4] WILMARYS DEL VALLE MANZANO SOLORZANO, a/k/a "LA CHINA," [5] ENDRIK ALEXANDER MORALES-RIVERO, a/k/a "ENDRI," [6] ARIANNYS BEATRIZ GUTIERREZ-CARRILLO, a/k/a "NANI" or "NANY," [7] FRANKYANNA DEL VALLE ROMERO-RIVERO, a/k/a "FRANYA," and**

**[8] JESUS ENRIQUE CASTILLO RODRIGUEZ a/k/a "CHU CHU,"** up to the value of said property listed above as subject to forfeiture.



A TRUE BILL

FOREPERSON

ROBERT E. MCGUIRE
ACTING UNITED STATES ATTORNEY

BROOKE K. SCHIFERLE
ASSISTANT UNITED STATES ATTORNEY

KATHLEEN WOLFE
DEPUTY ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

LINDSEY ROBERSON
JESSICA ARCO
Trial Attorneys
Human Trafficking Prosecution Unit